**PAUL J. FISHMAN**
United States Attorney
**BERNARD J. COONEY**
**LUCY MUZZY**
Assistant U.S. Attorneys
970 Broad Street, Suite 700
Newark, New Jersey 07102
Tel: (973) 645-2823
Fax: (973) 297-2045
Email: Bernard.Cooney@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       *Plaintiff*,<br><br>v.<br><br>LABIB E. RIACHI, MD, RIACHI, INC.,<br>CENTER FOR ADVANCED PELVIC<br>SURGERY, LLC,<br><br>       *Defendants*. | Civil Action No. |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, the United States of America ("United States"), alleges for its Complaint as follows:

## NATURE OF THIS ACTION

1.      For many years, Dr. Labib E. Riachi was one of the nation's most prolific Medicare billers of anorectal manometry, an invasive diagnostic test that involves inserting a probe into a patient's rectum. He was also among the top Medicare billers for a certain type of electromyography, another diagnostic test. Most of these tests, however, were never performed.

2.      Instead, Riachi's unqualified, non-physician staff treated his patients to little more than physical therapy. But Medicare only covers therapy services that a licensed therapist

provides. So even these therapy claims should not have been paid: During the relevant period, Riachi did not employ a single licensed physical therapist.

3.      After his patients received this "treatment," Riachi would sign the patient's chart as if a qualified therapist had performed the therapy and the diagnostic tests had actually been performed. Based on this pattern, Riachi, through his practice entities — defendants Riachi, Inc. and Center for Advanced Pelvic Surgery, LLC — caused to be submitted thousands of false claims for reimbursement to Medicare and Medicaid. This scheme resulted in millions of dollars of reimbursement that would not have been paid but for the defendants' misconduct.

4.      The United States brings this action under the False Claims Act and common law or equitable theories of fraud, payment under mistake of fact, and unjust enrichment, and seeks from the defendants treble damages, civil penalties, disgorgement of illegal profits, an accounting, interest, and other legal and equitable remedies available to this Court.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action under 31 U.S.C. §§ 3730(a) and 3732(a) and 28 U.S.C. §§ 1331 and 1345.

6.      This Court has personal jurisdiction over defendant Labib E. Riachi because he resides in this District and engaged in wrongdoing in this District.

7.      This Court has personal jurisdiction over defendants Riachi, Inc. and Center for Advanced Pelvic Surgery, LLC ("CAPS") because each defendant has their respective principal place of business located in this District and committed wrongdoing in this District.

8.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(c) and 31 U.S.C. § 3732 because each defendant resided in or transacted business in this District and engaged in wrongdoing in this District.

## THE PARTIES

9.      Plaintiff United States brings this action on behalf of its Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), a division of HHS that directly administers the Medicare and Medicaid programs.

10.      Defendant Labib E. Riachi ("Riachi") is a physician who resides in Westfield, New Jersey and at all relevant times has practiced medicine in New Jersey. During the relevant time period, Riachi was the sole owner and primary physician of defendants Riachi, Inc. and CAPS.

11.      Riachi's private medical practice operates under the name of defendant CAPS. Riachi submitted or caused to be submitted claims to Medicare and Medicaid through both defendants Riachi, Inc. and CAPS for services purportedly provided to patients seen at his medical practice.

12.      Defendant Riachi, Inc. is a corporation with its principal place of business located in Westfield, New Jersey.

13.      Defendants CAPS has offices in Westfield and Elizabeth, New Jersey. CAPS shares the same office address in Westfield, New Jersey with Riachi, Inc. as its principal place of business.

## THE LEGAL FRAMEWORK

**A.      The Federal Health Care Programs — Medicare and Medicaid**

14.      Medicare is a federal health care benefit program that pays for the costs of certain health care services. Benefits are generally provided to individuals — referred to as Medicare "beneficiaries" — that are 65 years or older or disabled.

15. HHS administers and supervises the Medicare program. CMS is a division of HHS that, in turn, directly administers Medicare. CMS contracts with private insurance companies, known as "carriers" and "fiscal intermediaries," to receive, review, and pay claims for reimbursement from health care providers for the provision of services to Medicare beneficiaries.

16. Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal government and the fifty states jointly finance the program.

17. CMS administers Medicaid on the federal level.

18. Under the Medicaid program, the state directly pays providers. New Jersey, like most states, awards contracts to private companies to process Medicaid claims for payment. These private companies then generate funding requests to the state Medicaid program, which in turn obtains federal funds from the United States

19. The federal share of each state's Medicaid program varies state by state and may change each year. Among the states, the federal share is at least 50%, and as high as over 80%. In New Jersey, the federal share for fiscal year 2016 is approximately 50%.

20. During all times relevant to this Complaint, the New Jersey Medicaid program reimbursed for diagnostic tests, including anorectal manometry and electromyography.

21. By becoming a participating Medicaid provider, Riachi, like all other such providers, agreed to abide by all laws, regulations, and procedures applicable to that program, including those governing reimbursement.

**B.     Preconditions for Reimbursement from Medicare and Medicaid**

22.     In order to participate in the Medicare program, health care providers — such as defendants here — must enter into provider agreements with CMS.  As part of the agreement, the provider agrees to comply with all statutory and regulatory requirements for reimbursement from Medicare.

23.     Through entering the provider agreement, the provider certifies that they understand that payment of a claim is conditioned on the claim complying with the Medicare regulations and the law.

24.     For outpatient treatment, all Medicare reimbursement is subject to "Part B" of Medicare. Part B covers the costs of physicians' services and outpatient care, including diagnostic tests and physical therapy.

25.     Medicare covers only reasonable and necessary medical services.

26.     Providers have a duty to provide services only when they are medically necessary.

27.     Medicare regulations thus exclude from payment services that are not reasonable and necessary.

28.     Similarly, medical providers are authorized to submit claims to Medicare only for services that they actually rendered.

29.     To obtain Medicare reimbursement under Part B, providers submit a claim form, known as a CMS Form 1500.  Among other information, the provider must include on the claim form certain five-digit codes, known as Current Procedural Terminology codes ("CPT" codes). CPT codes include descriptive terms that identify the specific services rendered for which the provider seeks reimbursement.

30.     The provider must also certify on the Form 1500:

- that the information contained on the form is true, correct, and complete;
- that the form was prepared in compliance with Medicare laws and regulations; and
- that the services were medically reasonable and necessary for the diagnosis or treatment of illness or injury.

31.     In addition, on the Form 1500, providers must include the beneficiary's name and unique health insurance claim number, the amount billed for the services, the services provided, the date the services were provided, and the name and physician identification number of the physician that provided or ordered the services.

32.     Like Medicare, Medicaid covers only reasonable and necessary medical services.

33.     Medicaid providers have a duty to provide services only when they are medically necessary.

34.     Medicaid regulations thus exclude from payment services that are not reasonable and necessary.

35.     Similarly, medical providers are authorized to submit claims to Medicaid only for services that they actually rendered.

**C.     The False Claims Act**

36.     The False Claims Act provides for the award of treble damages and civil penalties for, among other things, knowingly causing the submission of false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729(a)(1).[1]

---

[1] The False Claims Act was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Given the nature of the claims at issue, § 3729(a)(1) of the statute prior to FERA, and as amended in 1986, and § 3729(a)(1)(A), are both applicable here. Section 3729(a)(1) applies to conduct before FERA was enacted, and § 3729(a)(1)(A) applies to conduct after FERA was enacted.  Section 3729(a)(1)(B) was formerly § 3729(a)(2) and is applicable to all claims in this case by virtue of § 4(f) of FERA.

37.     The FCA imposes liability on any person who: "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim [.]" 31 U.S.C. § 3729.

38.     The FCA does not require proof of specific intent to defraud.  For purposes of the FCA, "knowing" and "knowingly" mean that a person either: "(i) has actual knowledge of the [relevant] information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.*

39.     In short, a defendant may be liable under the FCA if they submit or cause to be submitted claims that they: (1) knew or should have known were false; or (2) if they acted with deliberate ignorance or reckless disregard of the truth or falsity of the claims at issue.

## FACTUAL ALLEGATIONS

### I.      Medical Background and Riachi's Practice

40.     During the relevant time period, Riachi practiced as an urogynecologist — an obstetrician gynecologist ("OB/GYN") with specialized training in treating pelvic dysfunction in women.

41.     Riachi focused his practice on treating women with urinary incontinence — the loss of bladder control — and pelvic organ prolapse — a disorder in which the pelvic muscles are weakened or damaged.

42.     The false claims at issue in this Complaint relate to the following group of tests and services that Riachi routinely billed together for the same patient encounter:

        (a) anorectal manometry, an invasive diagnostic test;
        (b) electromyography, another diagnostic test; and
        (c) various physical therapy services.

7

A.       **Anorectal Manometry ("ARM") Tests**

43.     For many years, Riachi was one of the nation's most prolific Medicare billers of ARM tests, an invasive diagnostic test used to examine a patient's anal sphincter muscles and rectum. Most — if not all — of the tests that Riachi billed for, however, were simply never performed.

44.     ARMs are generally used to evaluate patients with fecal or urinary incontinence.

45.     During the ARM test, a catheter with pressure sensors and a small balloon at the end is inserted into the patient's rectum. The balloon inflates in the rectum and the patient is directed to squeeze, relax, or push at different points during the exam.

46.     Due to the nature of the ARM test, patients often suffer discomfort or pain, especially when the balloon is inflated in their rectum.

47.     ARMs are billed to Medicare and Medicaid under CPT Code 91122.

48.     As a diagnostic test, ARMs may reveal damage to the anal or rectal muscles that requires surgery.

49.     The data that the test gathers, including the patient's anal pressure, are reflected in a report with various numerical measurements and a graph that displays pressure fluctuations in waves.

50.     ARMs are generally not performed on the same patient multiple times over the course of a year because they are a diagnostic tool and do not have therapeutic purposes.

51.     Yet, as set forth below, Riachi frequently billed Medicare and Medicaid for dozens of ARMs associated with the same beneficiary within a relatively short period of time.

**B.      Electromyography ("EMG") Tests**

52.     For most of the same beneficiaries that purportedly received an ARM test, Riachi also submitted or caused to be submitted claims to Medicare and Medicaid for surface electromyography, another diagnostic test.

53.     A surface EMG measures muscle activity to evaluate, among other ailments, fecal or urinary incontinence or related neuromuscular abnormalities. During the test, electrodes are placed on the patient's skin to detect a patient's muscle response or electrical activity.

54.     Surface EMGs are billed to Medicare and Medicaid under CPT Code 51784.

55.     Like ARMs, EMG tests are generally not performed on the same patient multiple times over the course of a year because they are a diagnostic tool and do not have therapeutic purposes.

56.     Yet, as set forth below, Riachi frequently billed Medicare and Medicaid for dozens of EMGs associated with the same beneficiary within a relatively short period of time.

**C.      Medicare and Medicaid Require that a Physician Perform or Supervise ARMs and EMGs**

57.     In order for Medicare or Medicaid to cover either ARMs or EMGs — which constitute diagnostic tests — a physician must either: (1) personally perform the test; or (2) supervise a non-physician who performs the test and who is also appropriately trained to do so.

58.     For EMGs, this also requires that the physician, at a minimum, must train the non-physician personnel who actually performs the diagnostic procedure.

59.     ARMs or EMGs that are furnished without the necessary level of physician supervision are not considered reasonable and necessary and are thus not covered for payment under Medicare or Medicaid.

### D.      Physical Therapy

60.      Along with ARMs and EMGs, most beneficiaries that sought treatment from
Riachi were also purportedly provided with outpatient physical therapy services: manual
electrical stimulation, *e.g.*, neuro-muscular stimulation (CPT code 97032); therapeutic exercises
(CPT code 97110); therapeutic activities (CPT code 97530), and a physical performance test
(CPT code 97750).

61.      Medicare covers these outpatient physical therapy services so long as qualified
personnel provided the therapy. Under Medicare rules that apply to therapy performed in New
Jersey, qualified personnel are limited to licensed physical therapists and licensed physical
therapy assistants who act under the supervision of a licensed physical therapist.

62.      Medicare does not pay for physical therapy services that support staff, such as
medical assistants, physical therapy aides or trainers provide. Although such support staff may
assist qualified physical therapists by performing services incident to physical therapy, they may
not provide direct physical therapy even if a licensed physical therapist supervised them while
doing so.

63.      As set forth above, Medicare only reimburses providers for services that are
medically reasonable and necessary. Only skilled physical therapy services are considered
reasonable and necessary and thus reimbursable. And only a qualified, licensed physical therapist
(or a therapy assistant acting under their supervision) may perform such services in order for
Medicare to cover the therapy.

64.      The defendants routinely billed Medicare for these physical therapy services even
though during the relevant time period, as described below, they did not employ a single licensed
physical therapist or therapy assistant.

II.     **The Defendants' False Claims and Fraudulent Conduct**

    A.     **The Defendants Certified that They Would Learn and Comply with Medicare and Medicaid Laws and Regulations and Would Not Submit False Claims**

65.     From on or about January 1, 2006, through on or about September 30, 2011 (the "Relevant Time Period"), the defendants were participating providers with Medicare and Medicaid.

66.     As a Medicare and Medicaid provider, Riachi knew or should have known that he must follow all applicable Medicare laws, regulations, and program instructions in order to get reimbursed by Medicare.

67.     Riachi submitted a provider application to Medicare on or around October 28, 2003, for himself and defendant CAPS.

68.     Riachi submitted a provider application to Medicare on or around August 8, 2006 for himself and defendant Riachi, Inc.

69.     In his applications to Medicare, Riachi stated that he was the sole owner of Riachi, Inc. and CAPS and would bill Medicare through these companies.

70.     As an individual practitioner, Riachi was the only individual authorized to sign the application. In doing so, Riachi certified and agreed to the following, both on his behalf personally and on behalf of defendants Riachi, Inc. and CAPS:

- to abide by the Medicare laws, regulations and program instructions;
- to an understanding that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions and on the supplier's compliance with all applicable conditions of participation in Medicare;
- that neither he nor Riachi, Inc. or CAPS would present or cause to be presented a false or fraudulent claim for payment to Medicare; and
- that neither he nor Riachi, Inc. or CAPS would submit claims with deliberate ignorance or reckless disregard for their truth or falsity.

71.     During the Relevant Time Period, the defendants submitted their claims to Medicare and Medicaid directly or through a third-party commercial billing service located in New Jersey.

72.     The defendants submitted or caused to be submitted claims to Medicare using the CMS submission forms 1500 described above in ¶¶ 29-31.

73.     When submitting a Form 1500, the defendants certified that: (1) the information on the form was true, correct, and complete; and (2) the services identified on the form were medically indicated and necessary to the health of the patient.

74.     In addition, on the Form 1500, the defendants included, among other things, the beneficiary's name, the amount billed for the services, the services provided, the date the services were provided, and the name and physician identification number of the physician that provided or ordered the services.

75.     Riachi was the only rendering physician identified on the false claims at issue during the Relevant Time Period.

76.     The defendants, or the third-party billing service acting on their behalf, then submitted the defendants' claims electronically to Medicare.

77.     Riachi submitted a provider application to New Jersey Medicaid on or around February 6, 2004.

78.     By becoming a Medicaid provider Riachi agreed to submit claims for only medically and reasonably necessary services and services actually provided.

79.     At all times relevant to this Complaint, Riachi was a participating Medicaid provider and submitted or caused to be submitted claims for reimbursement to the New Jersey Medicaid program.

12

80.     During the Relevant Time Period, the defendants, or the third-party billing service working on their behal, submitted the defendants' claims to Medicaid.

81.     When submitting claims to Medicaid, the defendants certified that the information provided on the claims form was true, correct, and complete, and that the services identified on the form were actually provided and were medically reasonable and necessary.

**B.     The Government's Investigation and the Defendants' Fraudulent Scheme**

82.     Prior to filing this Complaint, the government conducted an investigation of claims that Medicare and Medicaid paid to the defendants. This investigation included, among other things, a review of medical records subpoenaed from the defendants, a review of claims paid to the defendants, a review of Riachi's travel records, dozens of patient interviews, and interviews of some of the defendants' employees.

**1.     Riachi's Extreme Level of ARMs Billings**

83.     The investigation revealed that, from approximately 2006 through early 2011, Riachi was among the top ten Medicare billers for ARMs in the entire country.

84.     Compared to other physicians in New Jersey that billed Medicare during this same period for the ARM test, Riachi was an extreme outlier: Medicare paid Riachi more than quadruple the next highest billing doctor and the amount paid to Riachi alone was more than the amount paid to the next ten highest billers combined.

85.     On or about July 2011, Riachi became aware of the government's investigation. Almost immediately, the defendants completely stopped billing Medicare for ARMs and EMGs.

**2.     Riachi Frequently Billed Medicare While Overseas**

86.     The defendants submitted claims to Medicare for services purportedly provided in New Jersey while Riachi was in fact traveling overseas.

13

87.     For example:

- In July 2008, Riachi flew to Germany and was gone from the United States for over two weeks. Yet, during this same period, Medicare claims records revealed that he submitted over 270 claims, including many claims for ARM tests, EMG tests, and physical therapy.

- In August 2009, Riachi flew from the United States to Paris. While he was away, Medicare claims records revealed that he billed over 300 claims, including many claims for ARM tests, EMG tests, and physical therapy.

### 3.     Patient and Employee Interviews Described a Pattern of Fraudulent Conduct

88.     As part of its investigation, the government interviewed dozens of Medicare beneficiaries. These beneficiaries consisted almost exclusively of patients for whom Riachi billed multiple ARM tests even though ARMs are generally not performed on the same patient multiple times.

89.     Through his claims to Medicare for these beneficiaries, Riachi represented that he was the rendering provider and had numerous patient encounters with these patients — often numbering in the dozens.

90.     For virtually every encounter Riachi billed for the same group of tests and procedures: ARMs (CPT Code 91122); EMGs (CPT Code 51784); and the physical therapy services described above in ¶¶ 60-64 (CPT Codes 97110, 97530, 97750, and 97032) (collectively, the "Select False Claims").

91.     The government also interviewed members of Riachi's staff, which, during the Relevant Time Period, consisted mostly of medical assistants and other non-physicians.

92.     To the extent Riachi's practice intermittently employed any other physicians, those physicians had no involvement with the Select False Claims. The fraudulent claims

submitted to Medicare and Medicaid at issue in this Complaint exclusively identified Riachi as the rendering provider.

93.    The following pattern emerged from interviews with Riachi's patients and employees as the usual course of conduct that Riachi engaged in:

a.    The Initial Visit — Female patients, many of whom were elderly, would generally see Riachi because they suffered from urinary incontinence. After an initial examination, Riachi would often recommend a conservative, nonsurgical course of treatment, known as "pelvic floor therapy." As a technical matter, pelvic floor therapy does not include ARMs or EMGs.

This therapy consisted of physical therapy exercises that included electric stimulation aimed at strengthening the patient's pelvic muscles. In most cases, however, Riachi would never perform or supervise this therapy — or any diagnostic test — himself.

b.    The "Treatment" — Instead, Riachi's medical assistants and other non-physician staff treated the patients without any supervision from Riachi or any other physician. Not a single member of Riachi's staff that performed the "pelvic floor therapy" during the Relevant Time Period was a licensed physical therapist or otherwise qualified to perform physical therapy.

Alarmingly, this treatment often involved Riachi's unsupervised and unqualified support staff performing electrical stimulation, a form of physical therapy billed under CPT code 97032. During this therapy, the staff inserted an electric probe into the patient's vagina before often leaving the patient alone in an examination room. This presented a serious risk of patient harm: At least one patient interviewed stated that, after

15

being left alone, the electric probe inserted in her vagina fell out. When she picked it up off the floor, she received an electric shock.

c.      <u>ARMs and EMGs Were Not Actually Performed</u> — At no point did the medical assistants, Riachi, or anyone else perform an ARM or otherwise insert a probe or catheter into the patient's rectum: Medical assistants consistently stated during interviews that they did not perform ARMs or place a probe into a patient's rectum.

But they still indicated on the patient's "superbill," an itemized form used to reflect which services were rendered — and which would ultimately be billed for — that the tests had been performed. By completing the superbill in this way, the assistants knew that the indicated services would be billed for. Some medical assistants even stated in interviews that they were expressly directed ***not*** to perform the ARM test yet still indicate on the superbill that the test had been performed.

Similarly, patients and employees indicated that EMGs were frequently not performed even though claims were submitted for these tests.

d.      <u>Riachi Signs Patient Charts and Authorizes the Submission of the Select False Claims</u> — Riachi's staff further explained that they were trained on how to indicate on patient charts and superbills that tests had been performed when in fact they had not been. Among other things, they were directed to rely on a sample superbill posted at Riachi's offices that showed how to circle the codes for the Select False Claims in each patient chart regardless of whether the indicated services had actually been provided.

After each patient visit, Riachi would then sign the patient's chart and evaluation forms to falsely represent that the Select False Claims had been performed. Based on these documents, including those bearing Riachi's signature, the defendants, using

Riachi, Inc.'s or CAPS' tax identification number, then submitted or caused to be submitted claims to Medicare and Medicaid for the Select False Claims.

### 4. Many of Riachi's Patients' ARM Test Results Were Inconsistent with the Test Actually Having Been Performed

94. As part of its investigation, the government reviewed patient charts, which included documents related to the ARM test that should have reflected data and other measurements associated with the test.

95. While a probe is inserted into the patient's rectum, the ARM test measures the patient's ability to hold a contraction and other aspects of their muscle strength.

96. Among other things, the test uses as a unit of measurement millimeters ("mmHG") of mercury, a measure of blood pressure.

97. For example, a patient with average strength may register 2.00 mmHG or more.

98. Because patients are directed during the test to alternatively squeeze and relax, the test results should also reflect some level of fluctuation in pressure during the test. This variation in the patient's contraction and pressure during the test should be displayed on a graph in the form of a horizontal wave that roughly rises and falls.

99. Many of Riachi's ARM results, however, were effectively blank: the mmHG level remained flat, at 0.1 — the default setting on the machine — and did not show any detectable measurement or fluctuation in the patient's anorectal pressure.

100. Had the ARM test actually been performed, the machine that captures the patient's pressure and strength and the resulting graph would not remain at the baseline setting of 0.1.

### 5.   Riachi's Knowledge of the Fraud

101.    Given the above, the government alleges that Riachi knowingly engaged in a fraudulent scheme and knew that the Select False Claims were false and should not have been submitted to Medicare or Medicaid.

102.    Even if, however, Riachi somehow did not have direct knowledge of the claims' falsity, he either should have known that the claims were false or acted with deliberate ignorance or reckless disregard of the truth or falsity of the claims at issue.

103.    Among other things, Riachi, on behalf of Riachi, Inc. and CAPS, certified in his Medicare and Medicaid provider applications that he would familiarize himself and comply with the Medicare and Medicaid regulations and laws. These rules require that he supervise his staff if they perform diagnostic tests and that only a licensed physical therapist perform physical therapy.

104.    He also certified that he would only submit claims for reasonable and necessary medical services and only for services that were actually rendered.

105.    Riachi was also the sole rendering provider for the Select False Claims and responsible for supervising his staff, which consisted mainly of medical assistants. Riachi did not have a single licensed physical therapist on his staff during the Relevant Time Period.

106.    Riachi's staff further indicated that they were trained on how to complete superbills and submit other documents in furtherance of the fraud.

107.    In addition, for those patients for whom he billed for the Select False Claims, Riachi personally signed the patient's progress notes and chart attesting that the tests and services had been provided when, in fact, they had not been.

### 6.   Representative False Claims to Medicare and Medicaid

108.   As stated above, the government interviewed dozens of patients for whom Riachi billed Medicare for multiple ARMs. As a diagnostic test, ARMs are rarely performed on the same patient multiple times. Yet many patients interviewed had received — according to Riachi's Medicare claims — over 20 ARM tests.

109.   Every patient listed below in ¶ 112(a)-(q) stated that no probe or other object was ever inserted into their rectum, something that most patients would not soon forget — had it actually happened.

110.   In addition, most patients listed below for whom the defendants billed for EMGs indicated that no electrodes were ever placed on their bodies in a manner consistent with an EMG being performed.

111.    To the extent any EMGs were performed — which was very rare — it was Riachi's unqualified staff, and not Riachi himself, that performed them.

112.    The following are representative examples, identified through the government's investigation, of patients[2] and dates of service for which the defendants knowingly submitted or caused to be submitted false claims to Medicare and Medicaid for the Select False Claims:

    a.      On May 24, 2011, Riachi purportedly performed on patient M.A. procedures that were the basis for the Select False Claims.

           On June 10, 2011, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

           On June 24, 2011, Medicare paid Riachi, Inc. $487.51 for these tests and services.

---

[2]  In order to protect the privacy of the patients referred to, the United States will provide a list of the patient names and the partial health insurance claim numbers to counsel for the defendants, subject to a protective order.

Between September 24, 2009, and May 24, 2011, the defendants billed Medicare for 21 ARMs and 21 EMGs supposedly performed on patient M.A. which, in fact, were not performed.

b.     On April 28, 2011, Riachi purportedly performed on patient M.L. procedures that were the basis for the Select False Claims.

On May 10, 2011, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On May 24, 2011, Medicare paid Riachi, Inc. $487.51 for these tests and services.

Between September 9, 2009, and April 28, 2011, the defendants billed Medicare for 19 ARMs and 19 EMGs supposedly performed on patient M.L. which, in fact, were not performed.

c.     On September 8, 2010, Riachi purportedly performed on patient K.R. procedures that were the basis for the Select False Claims.

On October 18, 2010, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On November 1, 2010, Medicare paid Riachi, Inc. $492.37 for these tests and services.

Between July 23, 2009, and September 8, 2010, the defendants billed Medicare for 24 ARMs and 24 EMGs supposedly performed on patient K.R. which, in fact, were not performed.

d.     On April 6, 2010, Riachi purportedly performed on patient N.D. procedures that were the basis for the Select False Claims.

On April 14, 2010, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On April 28, 2010, Medicare paid Riachi, Inc. $482.99 for these tests and services.

Between December 15, 2009, and April 6, 2010, the defendants billed Medicare for 16 ARMs and 16 EMGs supposedly performed on patient N.D. which, in fact, were not performed.

e.      On October 27, 2010, Riachi purportedly performed on patient E.L. procedures that were the basis for the Select False Claims.

On November 8, 2010, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On November 22, 2010, Medicare paid Riachi, Inc. $399.66 for these tests and services.

Between May 28, 2008, and October 27, 2010, the defendants billed Medicare for 33 ARMs and 34 EMGs supposedly performed on patient E.L. which, in fact, were not performed.

f.      On October 4, 2010, Riachi purportedly performed on patient N.B. procedures that were the basis for the Select False Claims.

On October 25, 2010, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On November 8, 2010, Medicare paid Riachi, Inc. $399.66 for these tests and services.

Between October 09, 2008, and October 4, 2010, the defendants billed Medicare for 24 ARMs and 25 EMGs supposedly performed on patient N.B. which, in fact, were not performed.

g.      On March 21, 2011, Riachi purportedly performed on patient R.G. procedures that were the basis for the Select False Claims.

On June 22, 2011, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On July 6, 2011, Medicare paid Riachi, Inc. $487.51 for these tests and services.

Between July 12, 2010, and March 21, 2011, the defendants billed Medicare for 17 ARMs and 18 EMGs supposedly performed on patient R.G. which, in fact, were not performed.

h.      On April 23, 2009, Riachi purportedly performed on patient L.K. procedures that were the basis for the Select False Claims.

On May 12, 2009, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the

physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On May 26, 2009, Medicare paid Riachi, Inc. $489.16 for these tests and services.

Between March 26, 2009, and April 23, 2009, the defendants billed Medicare for 5 ARMs and 5 EMGs supposedly performed on patient L.K. which, in fact, were not performed.

i.      On March 1, 2010, Riachi purportedly performed on patient E.M. procedures that were the basis for the Select False Claims.

On March 3, 2010, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On March 17, 2010, Medicare paid Riachi, Inc. $482.99 for these tests and services.

Between January 5, 2010, and March 1, 2010, the defendants billed Medicare for 9 ARMs and 9 EMGs supposedly performed on patient E.M. which, in fact, were not performed.

j.      On December 3, 2010, Riachi purportedly performed on patient E.S. procedures that were the basis for the Select False Claims.

On December 8, 2010, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On December 22, 2010, Medicare paid Riachi, Inc. $399.66 for these tests and services.

Between July 2, 2010, and December 3, 2010, the defendants billed Medicare for 15 ARMs and 16 EMGs supposedly performed on patient E.S. which, in fact, were not performed.

k.      On June 30, 2009, Riachi purportedly performed on patient O.P. procedures that were the basis for the Select False Claims.

On July 21, 2009, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On September 4, 2009, Medicare paid Riachi, Inc. $489.16 for these tests and services.

Between October 2, 2008, and June 30, 2009, the defendants billed Medicare for 11 ARMs and 12 EMGs supposedly performed on patient O.P. which, in fact, were not performed.

l.      On April 19, 2010, Riachi purportedly performed on patient B.K. procedures that were the basis for the Select False Claims.

On May 5, 2010, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On May 19, 2010, Medicare paid Riachi, Inc. $482.99 for these tests and services.

Between December 2, 2008, and April 19, 2010, the defendants billed Medicare for 22 ARMs and 23 EMGs supposedly performed on patient B.K. which, in fact, were not performed.

m.     On November 9, 2010, Riachi purportedly performed on patient V.W. procedures that were the basis for the Select False Claims.

On November 10, 2010, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $1,125.00 was billed for these tests and services.

On November 24, 2010, Medicare paid Riachi, Inc. $424.14 for these tests and services.

Between July 3, 2009, and November 9, 2010, the defendants billed Medicare for 28 ARMs and 29 EMGs supposedly performed on patient V.W. which, in fact, were not performed.

n.     On December 6, 2010, Riachi purportedly performed on patient C.W. procedures that were the basis for the Select False Claims.

On December 8, 2010, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On December 22, 2010, Medicare paid Riachi, Inc. $399.66 for these tests and services.

Between February 15, 2010, and December 6, 2010, the defendants billed Medicare for 27 ARMs and 28 EMGs supposedly performed on patient C.W. which, in fact, were not performed.

o.      On June 6, 2011, Riachi purportedly performed on patient A.F. procedures that were the basis for the Select False Claims.

On June 15, 2011, using Riachi, Inc.'s tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $975.00 was billed for these tests and services.

On June 29, 2011, Medicare paid Riachi, Inc. $487.51 for these tests and services.

Between February 9, 2010, and June 6, 2011, the defendants billed Medicare for 22 ARMs and 23 EMGs supposedly performed on patient A.F. which, in fact, were not performed.

p.      On March 18, 2010, Riachi purportedly performed on patient G.G. procedures that were the basis for the Select False Claims.

On or about March 18, 2010, using CAPS' tax identification number, the defendants submitted or caused to be submitted claims to New Jersey Medicaid for the Select False Claims under the corresponding CPT codes for an ARM test (91122) and an EMG test (51784). A total amount of $700.00 was billed for these tests and services.

On May 10, 2010, Medicaid paid CAPS $451.38 for these tests and services.

Between December 16, 2009, and May 23, 2011, the defendants billed Medicaid for 11 ARMs and 12 EMGs supposedly performed on patient G.G. which, in fact, were not performed.

q.      On November 14, 2006, Riachi purportedly performed on patient E.La. procedures that were the basis for the Select False Claims.

On December 31, 2006, using CAPS' tax identification number, the defendants submitted or caused to be submitted claims to Medicare for the Select False Claims under the corresponding CPT codes for an ARM test (91122), an EMG test (51784) and the physical therapy services (97032 — manual electrical stimulation; 97110 — therapeutic exercises; 97530 — therapeutic activities; and 97750 — physical performance test). A total amount of $900.00 was billed for these tests and services.

On January 12, 2007, Medicare paid CAPS $544.33 for these tests and services.

Between April 13, 2006, and November 14, 2006, the defendants billed Medicare for 9 ARMs and 9 EMGs supposedly performed on patient E.La. which, in fact, were not performed.

## COUNT I

**False Claims Act, 31 U.S.C. § 3729(a)(1) and (a)(1)(A)**
**Presentation of False Claims**

113.    The United States incorporates by reference the preceding paragraphs of this Complaint as if set forth fully herein.

114.    The defendants knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval.

115.    By virtue of the false or fraudulent claims that the defendants presented or caused to be presented, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT II

**False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**Making or Using False Records or Statements**

116.    The United States incorporates by reference the preceding paragraphs of this Complaint as if set forth fully herein.

117.    The defendants knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claim.

118.    By virtue of the defendants' making, using, or causing to be made or used false records or statements material to false or fraudulent claims, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT III

### Common Law Fraud

119.    The United States incorporates by reference the preceding paragraphs of this Complaint as if set forth fully herein.

120.    The defendants submitted or caused to be submitted material and false claims to Medicare with knowledge of their falsity or reckless disregard for their truth, and with the intention that the United States would act upon the false claims to its detriment. The United States acted in justifiable reliance upon the truthfulness of these claims.

121.    Had the true facts been known to the United States, the United States would not have reimbursed the defendants for these claims.

## COUNT IV

### Unjust Enrichment

122.    The United States incorporates by reference the preceding paragraphs of this Complaint as if set forth fully herein.

123.    The United States claims the recovery of all monies by which the defendants have been unjustly enriched.

124.    By directly or indirectly obtaining Government funds to which they were not entitled, the defendants were unjustly enriched at the expense of the United States and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## COUNT V

### Disgorgement

125.    The United States incorporates by reference the preceding paragraphs of this Complaint as if set forth fully herein.

126.    This is a claim for disgorgement of profits earned by the defendants by knowingly submitting or causing to be submitted false claims.

127.    The defendants concealed their prohibited activity through false records, statements, and claims and failed to abide by their duty to disclose such information to the United States.

128.    The United States did not detect the defendants' prohibited conduct.

129.    This Court has the equitable power to, among other things, order the defendants to disgorge the payments the defendants received as a result of their violations of the False Claims Act.

## COUNT VI

### Payment Under Mistake of Fact

130.    The United States incorporates by reference the preceding paragraphs of this Complaint as if set forth fully herein.

131.    The United States claims the recovery of all monies by which the defendants have been paid by mistake.

132.    The false claims that the defendants submitted or caused to be submitted to the United States were paid by the United States based upon mistaken or erroneous understandings of material fact.

133.    The United States, acting in reasonable reliance on the truthfulness of the claims that the defendants submitted or caused to be submitted to the United States and the truthfulness of the records or statements that the defendants made, used, or caused to be made or used, paid certain sums of money, to which the defendants were not entitled, and the defendants are thus liable to account and pay such amounts, which are determined at trial, to the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States requests that judgment be entered in its favor and against the defendants jointly and severally as follows:

A.     On the First and Second Counts under the False Claims Act for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with prejudgment interest and all such further relief as may be just and proper.

B.     On the Third Count, for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and prejudgment interest, and for all such further relief as may be just and proper.

C.     On the Fourth and Sixth Counts for unjust enrichment and payment by mistake, for the damages sustained or amounts by which the defendants were unjustly enriched or by which the defendants retained illegally obtained monies, plus prejudgment interest, costs, and expenses, and all such further relief as may be just and proper.

D.     On the Fifth Count, for disgorgement of illegal payments obtained by the defendants and such further equitable relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Dated:  February 10, 2016
          Newark, New Jersey

Respectfully submitted,

PAUL J. FISHMAN
United States Attorney

By:     _Bernard J. Cooney_

BERNARD J. COONEY
LUCY MUZZY
Assistant United States Attorneys
*Attorneys for the United States*

29